UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CURTISS H. RICHARDS,**                    Case Number: 1:13 CV 1652

         Plaintiff,                    Magistrate Judge James R. Knepp II

   v.                    MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY,**

         Defendant.

## INTRODUCTION

Plaintiff Curtiss H. Richards seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties consented to the undersigned exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Commissioner's decision denying benefits is affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI, alleging disability due to diabetes, degenerative joint and disc disease, chronic obstructive pulmonary disease (COPD), arthritis, and high blood pressure. (Tr. 284). He alleged a disability onset date of July 2, 2010; his date last insured was March 31, 2011. (Tr. 228, 259). Plaintiff's claims were denied initially (Tr. 151, 160) and on reconsideration (Tr. 168, 175). Plaintiff requested a hearing before an administrative law judge (ALJ) on April 11, 2011. (Tr. 183). At the hearing held on April 17, 2012, Plaintiff, his attorney, and a vocational expert (VE) testified. (Tr. 31). Afterward, the ALJ determined Plaintiff was not disabled. (Tr. 8). On July 31, 2013, the Plaintiff filed the instant case. (Doc 1).

## FACTUAL BACKGROUND

Personal and Vocational History

Plaintiff was born on August 9, 1963 and was 48 years old on the date of the ALJ's decision. (Tr. 8, 252). Plaintiff dropped out of high school after completing the tenth grade and was able to read, write, and do basic math. (Tr. 39). Plaintiff's past work included ten-to-fifteen years as a logger and labor construction worker. (Tr. 20, 59).

At the hearing, Plaintiff averred he stopped working in construction due to chronic back pain. (Tr. 43). However, the ALJ noted that physician records indicated Plaintiff had been laid off, a point Plaintiff eventually conceded, clarifying he quit during the layoff. (Tr. 61, 602).

Plaintiff lived with his wife, who was on disability and did the cleaning and most of the shopping, although Plaintiff went with her to the grocery store. (Tr. 44, 227, 322-23). Plaintiff woke up most days by 7:00 A.M., had coffee, watched the morning news, had many friends, enjoyed movies, climbed a few stairs to get to his house, and was able to drive, mow his lawn with frequent breaks, and play cards. (Tr. 38, 47-48, 246, 290, 602-03). He said he did not want spine surgery because if he went forward with the procedure, he would end up in a wheelchair. (Tr. 60-61).

Relevant Medical Evidence

Plaintiff began physical therapy three days a week for thoracic spondylosis on January 12, 2009. (Tr. 344). He achieved several of his established therapy goals and was making progress on remaining goals. (Tr. 345). However, Plaintiff chose to discontinue therapy in March 2009 because it aggravated his symptoms. (Tr. 341).

On February 9, 2009, Plaintiff had a magnetic resonance imaging (MRI) performed on his thoracic and lumbar spine, which revealed a tiny right paramedian disc herniation at T6-7

without cord compression and a spur/disc complex at C6-7 that abutted the cord. (Tr. 338). The MRI of the lumbar spine revealed disc degeneration with bulging at each of the L1, L2, and L5 levels, but only mild central canal narrowing. (Tr. 338-39).

During the relevant time period, Plaintiff visited Michael J. Namey, D.O., for a number of medical concerns. Plaintiff complained of coughing at night and associated abdominal pain, possibly as a result of his Ace inhibitor. (Tr. 380, 470). Although his symptoms waxed and waned, Plaintiff generally noted improvement in his chronic cough and breathing symptoms over the next several years. (Tr. 430, 432, 433, 470, 486, 488, 511, 522, 584). Upon physical examination, typically his breath sounds were clear. (Tr. 430, 431, 433, 524). Plaintiff was advised to avoid exposure to smoke. (Tr. 433). In regard to breathing and COPD, Dr. Namey prescribed supplemental oxygen for nighttime use. (Tr. 381).

On most of Plaintiff's office visits to Dr. Namey, his chief complaint was paracervical and shoulder pain. (Tr. 430, 433, 469, 470, 488, 516, 521, 584, 593). Usually, physical examination revealed tenderness along the paracervical spine and decreased range of motion in the cervical and lumbar spine. (Tr. 429, 430, 431, 433, 469, 470, 585). Occasionally, paracervical spasm was noted as well. (Tr. 430, 431, 469). Additionally, beginning in September 2010, Plaintiff complained of occasional swelling and pain in his hands. (Tr. 429, 431, 470, 585). Rarely, elbow pain and discomfort were noted. (Tr. 469). Plaintiff responded well to injections, which he received on a number of occasions. (Tr. 469, 470, 518, 525, 586). He was also prescribed Naprosyn for arthritis symptoms, Ibuprofen for pain, and instructed to perform range of motion exercises. (Tr. 429, 469, 518, 519, 524).

Plaintiff occasionally had instances of high blood pressure, but generally his symptoms were managed with medication. (Tr. 430-33, 470, 486, 518, 584). Additionally, Plaintiff was

overweight; Dr. Namey discussed the importance of exercise and recommended Plaintiff exercise regularly. (Tr. 524, 586).

Dr. Namey referred Plaintiff to Mark Verdun, D.O., for a consultation regarding a two-month history of left elbow pain and numbness in his forearm and left hand. (Tr. 475). On February 2, 2011, Plaintiff told Dr. Verdun the cortisone injections from Dr. Namey made the numbness in his left elbow completely disappear but did not offer long-term pain relief. (Tr. 475). Plaintiff stated he split wood for twenty-to-thirty minutes a day with a light axe to heat his home. (Tr. 475).

Upon physical exam, Plaintiff was in no acute distress and had no erythema, edema, ecchymosis, or cutaneous lesions. (Tr. 475). He had no gross misalignment, medial-sided tenderness, or definitive Tinel's signs and an unrestricted range of motion in the left shoulder and elbow. (Tr. 475). However, he had tenderness to palpation over the lateral epicondyle of the left elbow and some mild tenderness to palpation and percussion over the ulnar. (Tr. 475). His intrinsic hand strength was intact without intrinsic wasting. (Tr. 475). He had decreased sensation globally over his entire left upper extremity over all dermatomes and nerve distributions distal to the elbow. (Tr. 475). His strength was +5/5 throughout. (Tr. 475). An age-appropriate range of motion of his cervical spine was observed. (Tr. 475). Review of x-rays revealed no acute fractures, dislocations, lesions, or significant arthrosis. (Tr. 475).

Dr. Verdun assessed lateral epicondylitis in the left elbow, carpal tunnel syndrome, and questionable left upper extremity cervical radiculitis. (Tr. 475). He asked Plaintiff to wear a wrist splint and gave him a left elbow injection. (Tr. 476). Dr. Verdun also ordered an EMG and nerve conduction study, which revealed a clinical diagnosis of very mild left sided carpal tunnel syndrome and active motor axon loss changes in nearly all the muscles innervated by the left

C6/7 roots/segments with minimal chronic motor axon loss changes in left biceps, anconeus, and pronator teres muscles. (Tr. 451, 476). The findings were consistent with a mild sub-acute on chronic intraspinal canal lesion affecting the left C6/7 levels. (Tr. 451).

At a follow-up appointment on March 17, 2011, Dr. Verdun reviewed the EMG and nerve conduction results and informed Plaintiff the carpel tunnel was very minimal and recommended splints as treatment. (Tr. 473). Plaintiff stated the injection in his elbow helped and he was not experiencing as much numbness in his left hand. (Tr. 473).

Regarding his back, Dr. Verdun told Plaintiff he observed extensive C6-C7 level injuries on the EMG and nerve conduction studies. (Tr. 473). Plaintiff told Dr. Verdun that he saw Dr. Siegel, a spine surgeon, who did not recommend surgery. (Tr. 473). Dr. Verdun advised Plaintiff to consider a second opinion and Plaintiff responded that he was attempting to get disability based on his cervical spine. (Tr. 473). Dr. Verdun advised he may want to talk to his lawyer first. (Tr. 473).

 On November 11, 2011, Plaintiff had another appointment with Dr. Verdun for left elbow pain and mild intermittent left arm numbness. (Tr. 538). Plaintiff admitted to not using the wrist splint as instructed. (Tr. 538).

A physical examination was consistent with the physical exam conducted at Dr. Verdun's office on February 2, 2011. (Tr. 475, 538). Additionally, Plaintiff's carrying angle was normal and he had pain with elbow flexion when gripping with his hand pronated. (Tr. 538). A review of x-rays indicated early degenerative changes at the C6 and C7 levels with no significant arthrosis, listheis, or fracture. (Tr. 538). Dr. Verdun treated Plaintiff with a corticosteroid injection and wrist splint. (Tr. 538). At a follow-up appointment on March 27, 2012, Plaintiff stated the injection worked "wonderfully except for the last couple of weeks" and he had less pain; he also

stated the wrist splint helped the elbow pain. (Tr. 611). Plaintiff received another corticosteroid injection. (Tr. 611).

On April 26, 2011, Dr. Namey wrote a letter of clarification stating Plaintiff had COPD, sleep apnea, and chronic bronchitis. (Tr. 484). Plaintiff used an inhaler and nebulizer machine with Albuterol to manage his chronic diseases. (Tr. 484). Additionally, Plaintiff used a CPAP machine at night for his sleep apnea. (Tr. 484). Dr. Namey stated Plaintiff had decreased lung function that had worsened over the years and opined he would likely require the use of "breathing helps" for the rest of his life. (Tr. 484).

On July 14, 2011, Plaintiff met with John Hill, M.D., a pain specialist, on referral from Dr. Namey. (Tr. 504). Plaintiff complained of neck pain, headaches, and stiffness and arthritis in his hands. (Tr. 504). He rated his pain between six and nine (with ten being the worst) and stated everything he did aggravated the pain and nothing made it better. (Tr. 504). A physical examination was unremarkable except for some increased pain with range of motion in the cervical spine. (Tr. 504). Cranial nerves II-XII were grossly intact and pulses were present in all extremities. (Tr. 504). His lungs were clear. (Tr. 504). Sensation was grossly intact in the upper and lower extremities, 2+ reflexes were present at brachials and patellas bilaterally, and he had 5/5 strength in his right and left upper and lower extremities. (Tr. 504). He had increased pain with range of motion of his cervical spine. (Tr. 504). Dr. Hill recommended a series of cervical facet and medial branch nerve blocks, with which Plaintiff agreed to proceed. (Tr. 504-05). Dr. Hill treated with Naprosyn and Flexeril. (Tr. 505). Dr. Hill did not feel narcotics were indicated for Plaintiff on a long-term basis and did not renew Plaintiff's Vicodin prescription. (Tr. 505).

In a letter dated November 28, 2011, Dr. Namey said Plaintiff was medically unemployable for the foreseeable future. (Tr. 609). He indicated Plaintiff's breathing was

negatively impacted by COPD, sleep apnea, and chronic bronchitis. (Tr. 609). Dr. Namey opined Plaintiff's condition would continue to deteriorate in the future. (Tr. 609).

<u>Opinion Evidence</u>

On November 27, 2007, Dr. Namey completed the Ohio Department of Job and Family Services Mental Functional Capacity Assessment. (Tr. 227). Dr. Namey indicated Plaintiff was not significantly limited in every category except he was moderately limited in "ability to complete a normal workday and workweek without interruptions". (Tr. 327-28). Dr. Namey indicated Plaintiff was unemployable. (Tr. 328).

Dr. Namey also completed a physical functional capacity assessment on November 27, 2007. (Tr. 330). Dr. Namey found Plaintiff could stand or walk for one-to-two hours in an eight-hour workday and for one-half hour without interruption; could sit for five hours in an eight-hour workday and for fifteen minutes without interruption; and could lift or carry six-to-ten pounds frequently and occasionally. (Tr. 330). Dr. Namey assessed Plaintiff as being extremely limited in his ability to push, pull, bend, and reach and moderately limited with respect to handling and repetitive foot movements. (Tr. 330). The limitations were the result of Plaintiff's degenerative joint disease of the cervical and lumbar spine and hands. (Tr. 330). Again, Dr. Namey indicated Plaintiff was unemployable. (Tr. 330).

On March 14, 2008, consultative examiner Richard Halas, M.A., examined Plaintiff and completed a mental functional capacity assessment for the Ohio Department of Job and Family Services. (Tr. 334-35, 600-04). Mr. Halas indicated Plaintiff had mental impairments ranging from not significantly limited to extremely limited. (Tr. 334). Mr. Halas also indicated the limitations were expected to last twelve months or more and Plaintiff was unemployable. (Tr. 335).

Dr. Namey examined Plaintiff and completed a medical form for the Ohio Job and Family Services on October 9, 2009, where he listed Plaintiff's medical conditions as diabetes mellitus; degenerative joint disease of the cervical, dorsal, and lumbar regions of the spine; decreased range of motion; and hypertension. (Tr. 546). Dr. Namey opined Plaintiff could sit, stand, or walk for two hours in an eight-hour workday and for one-half hour without interruption. (Tr. 547). Plaintiff could lift eleven-to-twenty pounds frequently and occasionally; was markedly limited in ability to push, pull, bend, and make repetitive foot movements; and moderately limited in ability to reach. (Tr. 547). He added Plaintiff was unemployable and that his physical limitations were expected to last for twelve months or more. (Tr. 547).

On May 20, 2010, Dr. Namey completed a "Medical Statement Regarding [COPD] Where Smoking is Issue." (Tr. 386). He checked the diagnostic criteria of dyspnea on exertion, sputum production, COPD, chronic cough, chronic bronchitis, and wheezing. (Tr. 386). He indicated Plaintiff had been exposed to passive smoking by his wife and mother and prescribed supplemental oxygen at night. (Tr. 386). Dr. Namey indicated Plaintiff could work for two hours per day; stand or walk for fifteen minutes in an eight hour-workday; sit for 30 minutes in an eight-hour workday; and lift up to twenty pounds occasionally and five pounds frequently. (Tr. 386). He also indicated that Plaintiff could not tolerate dust, smoke, or fumes. (Tr. 386).

Dr. Namey completed an "Evaluation of Impairment of the Hands" on May 27, 2010 where he indicated an onset date of 2007 for Plaintiff's hand impairment (which involved both hands). (Tr. 383). Plaintiff's treatment included Lortab and Mobic, which resulted in unchanged symptoms. (Tr. 383). Plaintiff was able to care for his personal needs with difficulty due to dropping things, weakness, and swelling of the hands and fingers. (Tr. 383). Physical examination revealed swollen, red, and warm fingers; moderate atrophy on the thenar and

8

hypothenar surface of the hands; and moderately weak grip strength. (Tr. 383-84). The impairment interfered with Plaintiff's use of fingers, hands, and arms to a severe degree in relation to fine, dexterous movements. (Tr. 384). Dr. Namey commented that Plaintiff was very concerned over his hand weakness because he often dropped even light items. (Tr. 385).

State agency medical consultant Katherine E. Binns, D.O., reviewed Plaintiff's records and completed a residual functional capacity (RFC) assessment on January 22, 2011. (Tr. 107). She opined Plaintiff could lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand or walk for a total of four hours in an eight-hour workday; and sit for six hours in an eight-hour workday. (Tr. 102-03). He had a limited ability to push or pull in both upper extremities. (Tr. 103). Plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl and never climb ladders. (Tr. 103). He had limited ability to handle and finger in both hands and must avoid concentrated exposure to extreme temperatures, fumes, poor ventilation, and hazards such as machinery and heights. (Tr. 103-04). Dr. Binns noted that Plaintiff had some swelling in his hands but no range of motion or grip difficulties. (Tr. 104).

On April 4, 2011, state agency medical consultant Elizabeth Das, M.D., reviewed Plaintiff's records and affirmed most of Dr. Binns' findings. (Tr. 130-133). However, Dr. Das indicated Plaintiff was capable of standing or walking for six hours in an eight-hour workday and was limited in left overhand reaching ability. (Tr. 131-131).

On October 14, 2011, Dr. Namey completed a cervical spine RFC questionnaire. (Tr. 531). He opined Plaintiff's cervical degenerative disc disease had a poor prognosis, Plaintiff had chronic neck pain with paresthesia in both arms, and signs and symptoms including tenderness, crepitus, muscle spasm, muscle weakness, sensory changes, impaired sleep, abnormal posture, motor loss, and reduced grip strength. (Tr. 528). He indicated Plaintiff had range of cervical

motion with 5% extensor, 45% left rotation, 20% left lateral bending, 20% flexion, 45% right rotation, and 15% right lateral bending. (Tr. 528). Dr. Namey stated Plaintiff had associated severe headache pain which started in the back of the neck and went to the forehead. (Tr. 528). Plaintiff had vertigo, an inability to concentrate, impaired sleep, and mood changes associated with the headaches. (Tr. 528). Dr. Namey indicated Plaintiff had five-to-seven headaches a week each lasting two-to-four hours with dizziness. (Tr. 528-529). Dr. Namey said Plaintiff was not a malingerer. (Tr. 529). He stated Plaintiff experienced pain or other symptoms severe enough to interfere with the attention and concentration needed to perform simple work tasks constantly and was incapable of even low-stress jobs. (Tr. 529).

Dr. Namey added Plaintiff could walk half a block without rest or severe pain; sit or stand for fifteen minutes at one time; sit, stand, or walk for less than two hours in an eight-hour workday; required shifting positions at will and unscheduled breaks hourly for at least fifteen minutes; could never lift less than ten pounds; and could rarely look down, turn his head right or left, look up, or hold his head in a static position. (Tr. 530-31). He also stated Plaintiff could never twist, stoop, crouch/squat, or climb ladders or stairs. (Tr. 531). Additionally, Dr. Namey indicated Plaintiff had significant limitations with reaching, handling, or fingering. (Tr. 531). Dr. Namey found Plaintiff was capable of spending 0% of the workday grasping, turning, and twisting objects; performing fine manipulation; or reaching. (Tr. 531).

On a pain questionnaire completed that same day, Dr. Namey indicated Plaintiff had pain in his neck, poor breathing, and paresthesia. (Tr. 532). He also stated Plaintiff's complaints were reasonably derived from cervical degenerative disc disease and degenerative joint disease and weakness, crepitus, and imaging studies. (Tr. 532). The intensity and persistence of Plaintiff's pain affected his ability to complete most tasks and was severe enough to frequently interfere

10

with attention and concentration. (Tr. 532). Dr. Namey also opined Plaintiff's anxiety and depression were secondary to pain. (Tr. 532).

Also on October 14, 2011, Dr. Namey completed a diabetes questionnaire. (Tr. 533). According to the questionnaire, Plaintiff had Type II diabetes, insulin resistance, general malaise, and psychological problems including depression. (Tr. 533). Dr. Namey again opined Plaintiff was unable to work, could stand or sit only fifteen minutes at one time, and was unable to lift any weight or balance. (Tr. 533). However, he indicated Plaintiff could stand or walk for less than one hour total per workday. (Tr. 533). Dr. Namey also noted Plaintiff would need to elevate his legs to the waist most of the time during the workday. (Tr. 533).

### *ALJ Decision*

The ALJ determined Plaintiff had several severe impairments, including affective disorder, cervical and lumbar degenerative disc disease, obesity, hypertension, COPD, chronic bronchitis, and lateral epicondylitis of the left elbow. (Tr. 12-14). However, the ALJ determined Plaintiff did not have an impartment or combination of impairments that equaled the severity of the listing of impairments found in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14-16). The ALJ found Plaintiff had the RFC to perform a range of limited light work, could find work as a bench assembler or mail clerk, and was not disabled. (Tr. 16-24).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medially determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff contends the ALJ: 1) did not provide good reasons for affording "little weight" to Dr. Namey's opinions; and 2) erred by failing to mention all three of Dr. Namey's opinions from October 14, 2011. (Doc. 16). Each argument raises the well-known treating physician rule.

***Treating Physician Rule***

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good

reasons" for the weight given to a treating physician's opinion. *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

First, the ALJ provided good reasons for affording little weight to Dr. Namey's opinions made before October 14, 2011. Namely, the ALJ afforded little weight to the opinions because they were not supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with the other substantial evidence in the case record, including Plaintiff's activities of daily living. (Tr. 21, 38, 47-48, 246, 290, 475, 602-03). The ALJ also commented on the supportability of the opinions, noting the check-box statements included restrictions such as use of foot-controls that were not even alleged by Plaintiff and Dr. Namey's comment that he did not anticipate improvement was a "self-fulfilling prophecy" where Plaintiff refused to participate in physical therapy or seek additional surgical workup. (Tr. 22, 330, 341, 473). In short, and as further explained below, by commenting on the opinion's supportability and consistency with the

14

record, the ALJ complied with the regulatory obligations of the treating physician rule with respect to Dr. Namey's cited opinions.

However, as the Commissioner admits, the ALJ did not expressly mention Dr. Namey's three opinions rendered on October 14, 2011, although he generally afforded little weight to "Dr. Namey's series of medical opinions". (Doc. 17, at 11; Tr. 21). The unmentioned opinions addressed Plaintiff's functioning capacity with respect to cervical spine impairments, pain, and diabetes. (Tr. 528-35). The Sixth Circuit has identified failure to mention and consider the opinion of a treating source as a breach of the *Wilson* rules. *Blakely*, 581 F.3d at 407-08. Therefore, absent a finding of harmless error, this Court must remand.

### Harmless or Not

Here, the Commissioner contends the ALJ's error is harmless because the omitted opinions are repetitive in substance. (Doc. 17, at 11). Conversely, Plaintiff argues the October 14, 2011 opinions raise new evidence regarding degenerative disc disease and diabetes and are Dr. Namey's only opinions from the relevant time period. (Doc. 18, at 2). For the following reasons, the Court finds the ALJ's treatment of the evidence of record sufficiently undermines the consistency of Dr. Namey's October 2011 opinions with the record as a whole, therefore the error is harmless.

A violation of the treating physician rule is harmless error if: 1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons – even though [he] has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. "An ALJ may accomplish the goals of this procedural

requirement by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record." *Id.* (citing *Nelson*, 195 F. App'x at 470-72). The Court looks to the ALJ's decision, as opposed to the other evidence in the record, for support. *Coldiron*, 391 F. App'x at 440.

On October 14, 2011, Dr. Namey completed a cervical spine RFC (Tr. 528), pain questionnaire (Tr. 532), and diabetes questionnaire (Tr. 533). In those opinions, Dr. Namey generally indicated Plaintiff experienced pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 529). He also stated that Plaintiff was incapable of even low stress jobs. (Tr. 529). Dr. Namey opined Plaintiff was only capable of walking half a block without rest; could sit and stand for up to fifteen minutes at one time and for less than two hours in an eight-hour workday; required the ability to shift positions at will and take unscheduled breaks hourly for at least fifteen-to-twenty minutes; could never lift less than ten pounds; could rarely look down, turn his head right or left, look up, or hold his head in a static position; and could never twist, stoop, crouch, squat, or climb ladders or stairs. (Tr. 531).

Additionally, Dr. Namey indicated Plaintiff had significant limitations with reaching, handling, or fingering. (Tr. 531). Dr. Namey stated Plaintiff was capable of spending 0% of the workday grasping, turning, and twisting objects, performing fine manipulation, or reaching. (Tr. 531). He added Plaintiff's complaints were reasonably derived from his cervical degenerative disc disease, degenerative joint disease, weakness, crepitus, and imaging studies and the intensity and persistence of Plaintiff's pain affected his ability to complete most tasks. (Tr. 532).

In the diabetes questionnaire, Dr. Namey opined Plaintiff was unable to work and could stand or sit only fifteen minutes at one time and could stand or walk less than one hour total per

workday. (Tr. 533). Dr. Namey again indicated that Plaintiff was unable to lift or balance. (Tr. 533). Dr. Namey also noted that Plaintiff would need to elevate his legs to the waist most of the time during the workday. (Tr. 533).

Following close and careful review, the Court finds the ALJ indirectly attacked these opinions through his treatment of the record (which largely included evidence from the relevant time period), the additional opinion evidence of record, and Plaintiff's credibility. Therefore, the goals of the treating physician rule have been satisfied. *See*, *Daily v. Colvin*, 2014 U.S. Dist. LEXIS 82267, at *19 (N.D. Ohio) (the Court may consider whether the ALJ's opinion taken as a whole, "thoroughly evaluates the evidence and indicates the weight the ALJ gave it") (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006)).

Indeed, the ALJ indirectly attacked Dr. Namey's October 14, 2011 opinions through his treatment of Dr. Namey's earlier opinions. The ALJ gave many examples of inconsistencies between Dr. Namey's statements made in earlier opinions and the medical records. (Tr. 21-22). For example, Plaintiff had waxing and waning of symptoms and responded well to cervical spine and elbow injections. (Tr. 21, 430, 432-33, 469-70, 486, 488, 511, 518, 522, 525, 584, 586). Additionally, Plaintiff was primarily treated with only non-narcotic pain medication. (Tr. 21, 47, 429, 469, 505, 519, 524). As the ALJ pointed out, Dr. Namey recommended Plaintiff engage in an exercise program, which is usually not a suggestion for an individual with disabling musculoskeletal impairments. (Tr. 21-22, 524, 586). Moreover, as the ALJ noted, all of Dr. Namey's opinions are generally repetitive in that they are very restrictive of Plaintiff's abilities. (Tr. 21). This statement holds true for Dr. Namey's October 14, 2011 opinions as well. Indeed, the October 2011 opinions are generally consistent with the earlier opinions with respect to functional limitations, precluding Plaintiff from even sedentary work. (Tr. 21, 330, 383, 386,

528-35, 547). In addition, the ALJ commented on the supportability of the check-box opinions in light of the fact Plaintiff refused to participate in physical therapy or seek additional surgical workup. (Tr. 22, 330, 341, 473).

What is more, the ALJ afforded great weight to the state agency medical consultant's opinion because it was consistent with the record, Plaintiff's physical examinations, and his ability to perform outdoor chores. (Tr. 22). Of importance, the ALJ's discussion is complete with analysis and extensive fact-finding. *See, Dailey*, 2014 U.S. Dist. LEXIS 82267, at *21.

As mentioned, the ALJ extensively summarized Plaintiff's objective tests, including an MRI of Plaintiff's thoracic spine demonstrating less than severe findings (Tr. 338-39); an EMG nerve conduction study that was consistent with very mild carpal tunnel syndrome, mild sub-acute chronic intraspinal canal lesion affecting the left C 6/7 levels, and minimal non-specific motor unit changes in the right bicep (Tr. 451, 476); an x-ray of the cervical spine showing essentially mild degenerative changes (Tr. 538); a chest x-ray with limited results due to poor inspiratory effort (Tr. 356); and a pulmonary function test revealing essentially a normal spirometry result (Tr. 442). (Tr. 18).

In addition, the ALJ considered Plaintiff's treatment history together with its effectiveness and any side effects. (Tr. 17-20). He noted Plaintiff generally treated with non-narcotic pain medication and was told to exercise. (Tr. 21-22, 524, 586). Furthermore, he indicated Plaintiff used a CPAP at night for sleep apnea, briefly participated in physical therapy, used a wrist splint, did not receive surgery, used an inhaler, and received a series of injections, which he said improved his symptoms. (Tr. 19-20, 341, 344-45, 469-70, 473, 484, 518, 525, 586). The ALJ added that Plaintiff said physical therapy made his symptoms worse and he occasionally got dizzy or light headed. (Tr. 17-19).

18

Regarding physical examinations, the ALJ indicated they generally revealed cervical spine tenderness, spasm, and reduced range of motion with evidence of intermittent improvement. (Tr. 18, 429-31, 433, 469-70, 585). As the ALJ explained, Plaintiff had no disturbances in his gait, could heal and toe walk, had full grip strength in his hands at times, did not allege daily dizziness, and there was no evidence Plaintiff had difficulty sitting. (Tr. 18, 104, 475, 504). Moreover, contrary to his allegations that physical therapy made his symptoms worse, treatment records indicated Plaintiff experienced a moderate decrease in intensity of cervical pain and met some of his treatment goals. (Tr. 19, 341-45).

With respect to activities of daily living, Plaintiff was able to live independently with his spouse; wake up in the morning, have coffee, and watch the news; split wood for thirty minutes per day in the winter months; mow his half-acre lawn with breaks; and climb a few stairs to access his home. (Tr. 15, 20, 38, 47-48, 246, 290, 602-03).

The ALJ's treatment of Plaintiff's credibility also indirectly attacks the supportability of Dr. Namey's findings. Indeed, the ALJ addressed Plaintiff's conflicting statements regarding the end of his last job, pointing out that Plaintiff said at the hearing he left his last position due to his impairments, but he told a consultative examiner that he was laid off. (Tr. 20, 43, 61, 602). In addition, the ALJ said Plaintiff had never been referred to or involved with the State Bureau of Vocational Rehabilitation. (Tr. 20, 602). Moreover, the ALJ further discussed Plaintiff's comments that he was attempting to get disability based on his cervical spine pain, which suggested Plaintiff was not seeking treatment to improve his functioning. (Tr. 20, 473). The ALJ also noted Plaintiff's unsupported testimony regarding the grave medical risks of surgery and failure to seek a second opinion regarding surgical intervention, "which one would expect from

an individual complaining of the severe musculoskeletal pain and limitations" alleged by Plaintiff. (Tr. 20, 60-61).

Last, the ALJ considered Plaintiff's diabetes, but determined it was not a severe impairment. (Tr. 14). The ALJ said Plaintiff had not indicated to any medical professional that he experienced any symptoms from diabetes, there was no evidence of neuropathy or end-state organ damage, and no medical provider had indicated that Plaintiff's diabetes imposed any restrictions on his work capacity. (Tr. 14). On one hand, in one of the October 2011 opinions, Dr. Namey indicated that diabetic symptoms limited Plaintiff's ability to stand, sit, and balance. (Tr. 533). But, on the other hand, there is minimal evidence of Plaintiff's complaints related to diabetes, no evidence of neuropathy or end-state organ damage, and minimal evidence of functional limitations by the condition. *See*, *Jones*, 336 F.3d at 477 (the Court must affirm even where substantial evidence supports an alternative result). Moreover, as discussed above, the record makes sufficiently clear the ALJ's reasons for rejecting Dr. Namey's opinions.

Plaintiff directs the Court to *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013), in which the Sixth Circuit re-emphasized that the Commissioner is required to determine whether the treating physician deserves controlling weight and if it does not, then a determination of the weight the opinion deserves must be based on factors set forth in 20 C.F.R. §§ 404.1537(c)(2)(i)-(ii), (3)-(6). While *Gayheart* certainly relates to the instant case, the ALJ gave good reasons for not assigning controlling weight to the treating physician opinions; therefore, it does not require remand here.

It is true that Dr. Namey's October 2011 opinions are the only treating physician opinions written after the alleged onset date of July 2, 2010. (Tr. 228, 528-35). Additionally, the opinions provide limited additional information regarding Plaintiff's degenerative disc disease and

20

diabetes. (Tr. 528-35). However, as explained above, the ALJ's decision as a whole makes clear his reasons for discrediting Dr. Namey's October 2011 opinions. Of particular importance is the ALJ's thorough analysis of the record, which includes evidence primarily from the relevant period. Moreover, the ALJ did discuss Dr. Namey's opinions from May 27 and June 22, 2010 – only weeks before the alleged onset date. For these reasons, and following careful review of the ALJ's decision, the ALJ's treatment of the opinion evidence is affirmed. *See*, *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (where remand would be an "idle and useless formality", the Court is not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.*, 395 U.S. 759, 766 n.6 (1969)).

Finally, in Plaintiff's prayer for relief, he summarily asks the Court to compel the ALJ to "call on a medical expert to attend his remand hearing." (Doc. 16, at 23). However, Plaintiff does not challenge the absence of a medical expert at the relevant hearing on review, nor does he provide support for his request that a medical expert is required in the future. For these reasons, Plaintiff's request is denied.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge